## Redden v. Commonwealth.

(Decided September 29, 1910).

### Appeal from Graves Circuit Court.

Homicide—Witness—Statements on Former Trial—Denial—Competency as Substantive Testimony.—On a trial of one for murder, a witness was asked by the attorney for the Commonwealth if

she did not make certain statements in her evidence before the coroner's jury, which she denied, then the Commonwealth was permitted to prove that she did make said statements. Held, that this evidence was competent to contradict the witness, but was not competent as substantive evidence before the trial jury as to how the difficulty really took place.

ROBBINS & THOMAS and B. C. SEAY for appellant.

JAS. BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General, and MOORMAN & WARREN for appellee.

OPINION OF THE COURT BY JUDGE HOBSON—Reversing.

Horace Redden, who was then nineteen years old, went with Dillard Luther, who is about the same age, in a buggy to a blacksmith's shop to get Luther's horse shod. On the way they met Herman Humphreys, who proposed to go with them, and got in the buggy and rode with them to the blacksmith's shop. While they were there they got some whiskey and all drank it, Humphreys getting pretty drunk and boisterous. After he got in this condition he commenced threatening that he would whip Lee Hicks, for whom he had been working. As they went along he forced the boys to stop the buggy now and then to see him dance on the side of the road. When they got to Hicks' house he made them stop again and went in to whip Hicks; but Hicks was not at home. He learned there that Hicks was down the road beyond his house, but between his house and Luther's house. When they reached Humphrey's house he told them he wanted to get a pistol to kill Hicks. They made some excuses to get rid of him, saying that they must go home and feed the horse. Finally he said he would get the corn and they could take the corn with them and feed the horse. But while he was gone they drove off and left him. When he found that they had driven off and left him he became very angry with them, and went to Luther's house where Luther's father had a number of guests. He there made threats against the two boys, which induced Luther's mother to telephone over to the place where Luther was to tell her son to keep out of his way. Not finding the boys there he went to the house of Mr. T. Hicks, a near neighbor, and tried to borrow a pistol, which Hicks refused to lend him. He then threatened to shoot the smoke-stack off of Hicks' house, and went to the house of John Wilson, where he

heard the boys were. As he approached the house the persons there heard him cursing as he came along through the woods, and at the suggestion of Mrs. Wilson young Luther went behind the house to keep out of sight. When Humphreys came up and told his mission, Mrs. Wilson told him that her husband was away, and asked him to go away, and have no trouble. But this, with ugly words, he refused to do. Not finding Luther, he went to his buggy, which was standing at the gate, and took out the buggy whip and commenced whipping the horse. When he did this and the ladies were frightened, Luther came from behind the house. Humphreys left off beating the horse with the whip, and commenced whipping Luther with it, and continued to whip him until he had broken the whip in two. He then demanded that Luther should go and get him a drink of water at the cistern. This Luther did. About this time Horace Redden drove up in his buggy, and Humphreys at once went up to him and said, "Get out of the buggy, I want to talk to you." Redden said, "You can talk to me sitting in the buggy." At this Humphreys started towards him with the two pieces of whip in his hand, saying, "I am going to whip you." Redden then drew his pistol, which he had in the buggy, and said, "Don't you come at me." Humphreys then stopped and walked over to Walter Jessup, who had come up, and asked Jessup to give him some cartridges. Jessup said he did not have any. While this was going on, Redden got out of his buggy and hitched his horse, still holding his pistol in his hands, the horse being between him and Humphreys. Humphreys then came around the horse's head toward Redden. Redden backed and said, "Don't you come on to me." Humphreys patted his breast and said, "This is as pretty a spot as you ever shot at." About this time he also said, "I haven't anything," and pulled his front breeches pocket wrong side out. Luther then went to Humphreys and said, "Come on now, and let's go." Humphreys answered, addressing himself to Redden, "I am going to kill you," and started to him. As he did this Redden raised his pistol and fired. The shot missed Humphreys. It was a self-acting pistol. Humphreys advanced on Redden, and he fired a second time, which shot hit Humphreys. After this Humphreys, according to the evidence for the Commonwealth, started away from Redden, and according to the evidence for the defendant, circled around him.

Redden continued to empty his pistol as fast as it would fire until he had shot the other four loads that were in it. After the last shot was fired, Humphreys walked off a few yards and fell. He soon thereafter died. Redden was indicted for murder. On the first trial of the case the jury failed to agree. On the second trial they found Redden guilty of voluntary manslaughter, and fixed his punishment at five years in the penitentiary. To reverse this judgment he appeals.

Humphreys was thirty years old, and was in his shirt sleeves, and while it is apparent now that he had no pistol, this was not so apparent at the time the difficulty began; and even upon the evidence for the Commonwealth it is manifest that he had determined to give Redden a beating with the horse whip, which he held in his hands if he did not do him other injury; and although Redden fired three or four shots after Humphreys had ceased to advance on him and was either circling around him or going from him, all the shots were fired in very rapid succession, the whole difficulty not lasting over ten seconds. Mrs. Wilson was the main witness for the defendant on the trial. After she had testified she was asked on cross-examination if she had not given certain testimony before the coroner's jury as to the facts of the homicide different from her testimony on the trial, and she said that she had not. In rebuttal the Commonwealth was allowed to introduce a number of witnesses who testified that Mrs. Wilson did testify before the coroner's jury as indicated by the questions. The evidence was competent to contradict Mrs. Wilson, but it was not competent as substantive evidence as to how the difficulty really took place; and the court should have so admonished the jury. No such admonition was given, and from the number of these witnesses and the importance that was apparently attached on the trial to this phase of her version of the difficulty, the failure to admonish the jury that the testimony as to what she said before the coroner's jury as to how the difficulty occurred was not to be considered as substantive evidence could but have been very prejudicial to the defendant. Dr. Sanford Sisson was also introduced on the trial, and was asked if he had not made a certain statement on the night of the homicide as to the back of Humphreys being powder burnt, the purpose being to show that Humphreys was shot in the back and at close range. In rebuttal the Commonwealth was

allowed to introduce several witnesses to show that the doctor did make this statement, and no admonition was given the jury that the testimony could only be considered for the purpose of impeaching Dr. Sisson. We see no other error in the record, but for the errors referred to which were very prejudicial to the substantial rights of the defendant, the judgment must be reversed. (Fueston v. Com. 91 Ky. 230; Gills v. Com. 18 R. 560; Jones v. Com. 20 R. 355; Mullins v. Com. 23 R. 2433; Ashcraft v. Com. 24 R. 490; Fuqua v. Com. 24 R. 2207; Alford v. Com. 26 R. 154.)

Judgment reversed and cause remanded for a new trial.