## McDaniel v. Commonwealth.

(Decided November 7, 1919.)

### Appeal from Warren Circuit Court.

1. Criminal Law—Setting Aside Verdict of Jury.—In criminal cases the verdict of a properly instructed jury will not be set aside on the ground of the insufficiency of evidence to support it unless the verdict is flagrantly against the evidence and strikes the mind at first blush as having been returned under the influence of passion and prejudice on the part of the jury.

2.  Criminal Law—Law of the Case.—The law as announced on the first appeal of the case is binding upon the parties in all subsequent appeals where the evidence is substantially the same. And this rule includes all questions expressly decided on the first appeal as well as those presented by the record but not noticed in the opinion, unless the opinion expressly refrains from passing on them. And this rule applies in criminal cases the same as in civil cases.

3.  Criminal Law—Impeachment—Instructions.—Admonition.—It is the duty of the court to instruct or admonish the jury as to the purpose and effect which should be given to impeaching testimony, but the error in failing to do so will be considered to have been waived unless the complaining party objected to the testimony at the time or moved for its exclusion, or requested the court to give the admonition, or in some way called the attention of the court to the error; for such admonitions are not technically instructions under the requirements of the Code that instructions should be in writing and that the court should instruct the jury in criminal cases upon the whole law of the case. But although the court's attention might be called to the error and it should fail to admonish the jury as to the purpose and effect of the testimony the judgment will not be reversed for the error unless it be both a material and prejudicial one.

MAX B. HARLIN for appellant.

CHAS. H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On April 22, 1918, the appellant, Bradley McDaniel, a colored boy about eighteen years of age, shot and killed Dee Spears, a white man, in the town of Smith's Grove in Warren County. He was indicted by a specially called grand jury in which he was charged with the crime of murder. The special term of court at which the indictment was found convened on May 14, 1918, and the indictment was found and returned in the forenoon of that day and the trial commenced that afternoon. The defendant was convicted and his punishment fixed at death and to reverse the judgment pronounced upon that verdict he prosecuted an appeal to this court, and the judgment was reversed solely upon the ground that the court should have granted a continuance of the case after the return of the indictment to such a time as would afford the defendant and his counsel a reasonable opportunity to make preparations for the trial.

The opinion will be found under the style of McDaniel v. Commonwealth, 181 Ky. 766, and in it we said:

"After a careful consideration of this record and the aid of oral argument as well as briefs by attorneys representing the Commonwealth and the accused, we have reached the conclusion that the judgment appealed from should be reversed and the defendant granted a new trial, and this, upon the sole ground that the motion for a continuance should have been sustained."

Upon a return of the case a second trial resulted in the same verdict, followed by the same judgment, and to reverse it defendant prosecutes this appeal.

On the first appeal as well as on the present one the grounds urged and relied on for a reversal of the judgment are identical, with the exception of one point which will be hereafter noticed. They were and are: (1) that the indictment should have been quashed because the order appointing the jury commissioners who filled the wheel from which the grand jury that found the indictment was drawn was not signed by the judge at the time and not until a subsequent term; (2) that the verdict is not sustained by the evidence; (3) that the court allowed improper testimony to be introduced; (4) that the court failed to admonish the jury concerning the purpose and effect of certain testimony.

In disposing of the first ground upon the former appeal we said in the opinion, *supra*:

"Passing now to other matters, there appears no reversible error in the ruling of the trial court in reference to the indictment or the manner in which the jury was selected, and so we will turn to the motion and grounds for a continuance." The ground based upon the insufficiency of the evidence to sustain the verdict was not referred to in that opinion, but because it was presented by the record and argued upon appeal it must now be determined on this appeal that the question is *res judicata* if the facts upon the two trials are substantially the same. New Bell Jellico Coal Co. v. Sowders, 162 Ky. 443; Ky. Traction & Terminal Co. v. Downing's Admr., 159 Ky. 502; M. C. & St. L. Ry. Co. v. Banks, 168 Ky. 579; City of Louisville v. Fidelity & Columbia Trust Co., Extr., etc., 182 Ky. 551; Consolidation Coal Co. v. Bailey, 183 Ky. 204; Thornton v. Durrette, idem, 267, and Cumberland Ry. Co. v. Girdner, 184 Ky. 375. Many other cases will be found referred to in these opinions.

It will be found that the rule does not apply alone to questions which were expressly determined by the former opinion but to all questions which were presented and

which might have been determined but not referred to in the opinion. Thus in the Bailey case, in speaking of the scope of the rule, we said:

"The rule is well settled that the opinion of this court on the first appeal of the case is the law of that case upon all subsequent appeals where the facts are substantially the same, not only as to errors relied upon for reversal upon the first appeal, but also as to all errors relied upon and not noticed in the opinion, all of which appear in the record on the first appeal and which might have been but were not relied on.   Consolidated Coal Co. v. Moore, 179 Ky. 293; N. C. & St. L. Ry. Co. v. Henry, 168 Ky. 455; Dupoyster v. Fort Jefferson Improvement Co., 121 Ky. 518; Ill. Life Ins. Co. v. Wortham, 119 S. W. (Ky.) 802; and Stewart's Admr. v. L. & N. Ry. Co., 136 Ky. 717."

In the Thornton case, speaking upon the same point, it is said:

"The judgment of this court on the former appeal being the law of the case, all questions which were then presented or were properly before the court are as conclusively settled, though not referred to in the opinion, as if they were specifically mentioned and considered."

The rule applies with equal force in criminal cases as it does in civil cases. Slaughter v. Com., 152 Ky. 128; Arnold v. Com., 23 Ky. Law Rep. 182; and Gambrel v. Com., 142 Ky. 839.

In the Slaughter case the defendant was indicted for murder and was convicted, his sentence being fixed at death, and upon his appeal the judgment was reversed solely upon the ground of improper argument by the commonwealth's attorney in the closing address to the jury. Slaughter v. Com., 149 Ky. 5.

It was contended upon the first appeal of that case that the evidence was insufficient to sustain a conviction for murder, but it was held otherwise, and upon the second appeal the same contention was made, but the opinion held that the question was foreclosed by the first opinion, saying:

"The evidence on the second trial is substantially the same as that heard on the first trial.   It is well settled that a decision by this court on a former appeal is the law of the case, and is binding not only on the trial court but this court as well.   This rule applies both in civil and criminal cases."

So that were we inclined to hold that any of the matters complained of upon the first trial which are also found in this record were erroneous we would be prevented by the above rule of practice from considering them upon this appeal. But out of abundant caution arising from the fact of the severity of the punishment, we have concluded to briefly notice the errors relied on, dismissing, however, ground (1), because it was expressly determined in the first opinion to be insufficient.

Taking up ground (2), the record discloses that the killing occurred in the early afternoon in front of the blacksmith shop operated by the deceased. The defendant was in the employ of and working for Lester Wright, a white man. In an automobile they went to the shop of the deceased for the purpose of having some harrow teeth sharpened and to have them stocked. Wright went into the shop and while he was there defendant brought in one load of the harrow teeth and was directed by deceased where to lay them, when he returned for the second and last load. In the meantime Wright had gone out of the shop to his machine and had gotten into it when the difficulty commenced. How it commenced and what occurred is thus told by the defendant in his testimony:

"When I got to the shop Mr. Lester gets out and goes into the shop and gets the teeth out, about half of them, and then packed them out, and I asked Mr. Lee where I was to lay them, and he said: 'Lay them down anywhere,' and I goes on then and lays the others down, and starts out, and Mr. Dee says 'Bradley?' and I says 'Sir,' and he says 'They tell me you have been beating up that boy of mine,' and I says 'Not first, he hit me with a rotten potato,' and I says 'Mr. Dee, I don't bother your boy. I attend to my own business,' and he says, 'Get out of here,' and I starts out, and I got off of the pavement down on the street, and he throwed the plank at me, and when he threw the plank I looked back and I was getting close to the car, and he was going to get a 2x4 under an old wagon, and I says, 'Mr. Dee, don't do that,' and he says 'You God damned son of a bitch, I will break your neck,' and I pulled my pistol and shot him."

He then said that he shot five times very rapidly and deceased fell where friends afterwards found him.

Wright, the only other witness who was immediately present, testified that;

"When Bradley put the teeth in the car I was sitting in the front seat preparing to start the car, and I told him to get in, and I pulled out in the street and turned around, and drove to the shop, and when I got to the shop I told him to get the teeth and I went in the shop and was talking to Mr. Spears about when he could get the harrow teeth fixed for me and some work he was doing then, and on the first trip Bradley made he asked Mr. Spears where he must put the teeth and he replied 'anywhere' there in the shop, and as he came in with the second load I went back to the car to start the engine, and he carried the second load in and was returning to the car and as he passed through the door Mr. Spears called to him and asked him what he meant by jumping on his boy and beating him up, and Bradley replied 'I didn't jump on your boy and beat him up, the boys were throwing potatoes at me, and I slapped him,' and Mr. Spears said 'You started this fuss with the boy and I can prove it' and Bradley replied 'No, sir; Mr. Dee, I don't bother nobody,' and he called him a son of a bitch, and said 'You son of a bitch, don't you——' do something, I didn't hear what it was, and the next thing I knew there was a chunk that hit the steering wheel and bounced back, and I then began to stop the engine, and it was on a hillside and the emergency wouldn't work and I had to put it in gear and put the emergency on to keep it from rolling down the hill and about the time I got this done the shooting was all over. Immediately before the shooting, though, I heard him say: 'Mr. Dee, don't be, don't do that,' and then the shooting began. Q. Did you see Mr. Spears after he got to the door of the shop, leaving the anvil or anything of that kind? A. The last time I saw him he was laying the hammer down and was leaving the anvil as he called him a son of a bitch."

These were the only witnesses who testified for defendant concerning the facts attending the shooting. On Friday before the Monday upon which the killing occurred, the defendant had twice slapped the eight-year-old boy of deceased at a restaurant in the town, and defendant says that he had been informed by the boy afterwards that the deceased had threatened to punish him for having slapped the boy and because of this fact defendant, on the Monday in question, put the pistol in his pocket, and he stated in his evidence that he did so for the purpose of preventing deceased or anyone else

from doing him harm. He, therefore, had the pistol in his pocket when he went to the shop and had been carrying it according to his testimony throughout the day.

Robert Kirby, a witness for the Commonwealth, testified that he was the manager of the water works of the town and his office was located just at the rear of the decedent's shop and in the same building; that he had come out of the shop but a few minutes before he heard the shot. He arose from his stooping position and looked towards the front of the shop and saw the automobile and Mr. Wright in it and saw smoke at the rear of the car.

On approaching nearer he saw the body of the deceased lying a few feet from the right hand wheel of the car; that the motor of the car was running and that the defendant was standing about midway of the car near a wagon in front of the shop, and that he saw the butt end of the pistol as the defendant threw it into the car; that he called on defendant to stop after he had started to walk away and asked him why he shot the deceased, receiving the answer: "He called me a son of a bitch."

Huston Bishop testified that he saw Wright and the defendant at the time they started with the car to the shop, and after the harrow teeth had been put into the car defendant said: "Wait a minute and I will go with you," and went back into Wright's place of business and returned, jumping upon the running board of the car where he rode to the shop of deceased.

Miss Bessie Davis was on the sidewalk eighty yards east of the shop. There was nothing to obstruct her view or to prevent her seeing in front of the shop. She says that the defendant had his back to her and that she saw deceased in front of him, but the car prevented her from seeing what, if anything, he was doing; that she saw nothing in the hands of the deceased nor did he attempt to do anything while the defendant was shooting at him.

Walter Stone testified that he was on the pavement across the street, about ninety-five feet from the scene of the killing, and when he heard the first shot he turned his head and saw the second, third and fourth ones; that he saw the hands of the deceased and that he had nothing in them except a glove on his left hand; that he was when witness first saw him "staggering or stumbling and trying to stand up, it looked like"; and

that he heard nothing said by either the deceased or the defendant.

Gill Edwards was in the store-room in front of which the witness, Stone, was standing, but it had a glass front. He testified that he saw the shooting after the first shot and that the parties were about ten feet apart; that deceased had nothing in his hands, but appeared to be going towards the defendant.

A number of witnesses testified that they arrived at the scene immediately after the shooting and that the deceased had nothing in his hands except a glove, nor did they find anywhere near him or in front of the shop at any place a 2x4 piece of timber as testified to by defendant, and there is no testimony in this record to show that such a piece of timber was in that locality except that of the defendant himself.

In the very recent cases of Little v. Commonwealth, 177 Ky. 24; Daniels v. Commonwealth, 181 Ky. 392; Ratliff v. Commonwealth, 182 Ky. 246; Bingham v. Commonwealth, 183 Ky. 688; Thomas v. Commonwealth, 185 Ky. 226, and Hale v. Commonwealth, 185 Ky. 119, it was held that verdicts in criminal cases will not be set aside on the ground of insufficient evidence to sustain them unless they are "so flagrantly against the evidence as to make it appear at first blush that the jury was influenced by passion and prejudice." Under this rule can it be said that the verdict in this case should be set aside?

It will be conceded that the jury are the judges of the facts and it has been held many times that they are not bound to accept the testimony of any particular witness to the exclusion of that given by others. In this case none of the witnesses who saw any part of the difficulty testify to any danger which deceased was able or about to inflict upon defendant that would authorize him to take the life of deceased in order to prevent it, except the defendant himself. It is true that the witness, Wright, heard insulting language from the deceased and saw the chunk which deceased is alleged to have thrown after it struck the automobile, but he saw nothing of the situation of the parties at the time of or after the beginning of the shooting. The defendant is contradicted by all of the witnesses of the Commonwealth who saw any part of the difficulty with reference to the deceased attempting to procure a scantling after he had thrown the chunk.

The defendant himself shows that he was not only prepared but intended to accept the first opportunity to use his pistol.

From this testimony and these circumstances, how can we say that the jury was not authorized to conclude that defendant harbored malice towards the deceased because of the supposed threats which he had heard and that he then and there determined to wreak vengeance upon the deceased upon the slightest pretext? While such a conclusion is not clearly established still it might appropriately be drawn from the testimony in the case; and under the rule, *supra,* even were this question now an open one, we are not prepared to say that the verdict is flagrantly against the evidence.

Turning now to grounds (3) and (4), the improper testimony complained of is the contradiction of the witness, Wright, in two particulars, they being (a) that the Commonwealth was permitted to show in rebuttal after proper foundation laid that the witness, Wright, on Sunday before the killing said "that Clarence Walker ought to have his head or face slapped off for interfering with McDaniel on Friday evening when he slapped the Spears boy"; and (b), to also prove in rebuttal that Wright, in the city of Bowling Green, upon the same afternoon of the killing said that he picked up the piece of wood which was in his automobile when the trip to Bowling Green was made and put it in the machine, when he had testified that the piece of wood fell in the machine just before the beginning of the shooting.

The same testimony in subdivision (a) was heard upon the first trial and complaint was made of it at that time as well as the failure of the court to admonish the jury to consider it for the purpose of affecting the credibility of the witness, Wright. But the failure of the court to admonish the jury concerning the testimony in subdivision (b) as well as the introduction of that testimony appeared for the first time upon this trial.

Under the *res judicata* rule, *supra,* the error, if any, with reference to the testimony in subdivision (a) as well as the failure of the court to admonish the jury concerning it, cannot be considered by us on this appeal, since it was at least impliedly determined on the first appeal that that objection to the verdict did not constitute an error, or if so, only an immaterial one. There was no objection in any form to the complained of tes-

timony in subdivision (b) nor was the court asked in either instance to admonish the jury concerning its purpose.

This court has held that it was error not to admonish or instruct the jury on the purpose for which a certain character of contradictory evidence may be considered. The cases so holding are: Feuston v. Commonwealth, 91 Ky. 230; Collins v. Commonwealth, 15 Ky. Law Rep. 691; Gills v. Commonwealth, 18 Ky. Law Rep. 560; Jones v. Commonwealth, 20 Ky. Law Rep. 355; Ashcraft v. Commonwealth, 24 Ky. Law Rep. 488; Fuqua v. Commonwealth, idem, 2204; Alfred v. Commonwealth, 26 Ky. Law Rep. 153; Mullins v. Commonwealth, 23 Ky. Law Rep. 2433; Sloan v. Commonwealth, 33 Ky. Law Rep. 266; Redden v. Commonwealth, 140 Ky. 94; Ruark v. Commonwealth, 150 Ky. 47; Johnson v. Commonwealth, 170 Ky. 766; Hayes v. Commonwealth, 171 Ky. 291; Renaker v. Commonwealth, 172 Ky. 712; and Day v. Commonwealth, 173 Ky. 269. In all of these cases it appears in the opinions that the defendant complained of the testimony, the effect and purpose of which he insisted that the jury should be admonished, either by way of objection to its introduction or by moving to exclude it or by specifically asking for the admonishing instruction, except in the Mullins, Fuqua and Redden cases.

We have examined the records of the Fuqua and Redden cases, and it appears that the testimony in the latter was objected to, and in the former a motion was made to exclude it from the jury.

The transcript of the testimony in the Mullins case was for some purpose sent to the lower court and we have not had an opportunity to examine it. So that it is fair to presume that the opinion in the latter case holding it to be prejudicial error to fail to give the admonishing instruction was based upon some objection in some form made by the defendant on the trial.

In the case of Oshsner v. Commonwealth, 128 Ky. 761, this court held that:

"An admonition or instruction limiting the effect of testimony is not within the definition of instruction as used in that section of the code" (25), and it was held that they need not be in writing nor were they included in the rule requiring the court in criminal trials to give to the jury the whole law of the case. That opinion further held, that for a defendant to take advantage of

the failure of the court to admonish the jury he must in some form call the attention of the court to the alleged error, saying:

"If the trial court's attention were called at the time to what is frequently a mere omission, it would have been corrected. To allow reversals for such lapses is to put a premium upon sharpness, rather than tend to the just and fair administration of the law. The failure of the accused or his counsel to have an exception where one is necessary in order to present the question for review on appeal is deemed in law, as it evidently is in fact, a waiver of the question."

In the Johnson case it was held that in order for the defendant to avail himself of the error he need not expressly ask for the admonition, but if he objects to the testimony or moves to exclude it, it will be sufficient.

The other cases following it hold to the same requirement on the part of the defendant, and further, that unless he calls the attention of the court, in some one or other of those methods, to the alleged error, he can not avail himself of it even though it should be determined that the error was prejudicial. But in the Johnson, Hayes, Day and Renaker cases, it was further held that the judgment will not be reversed although the court's attention may have in some one of the methods heretofore pointed out, been called to it and failed to give the admonition, unless the error under the circumstances is plainly prejudicial to the substantial rights of the defendant.

We cannot, therefore, consider the alleged error growing out of the contradiction of the witness, Wright, in subdivision (b) concerning how the chunk got into the automobile, since no objection was made to the testimony nor any motion made to exclude it, nor was the court asked to admonish the jury concerning it. We do not hold, however, that the error, if it could be considered, is of such a nature as to substantially prejudice the rights of defendant.

We realize that defendant has received the supreme penalty of the law and for that reason we have given the case close scrutiny. While the evidence upon the issue of his guilt of the crime of murder is not as satisfactory as it might have been, nor the verdict such as we might have rendered had we been on the jury, yet these circumstances raise questions more properly presentable to the Executive Department for a commuta-

tion of the sentence than to this court on appeal for a reversal of the judgment, since we are not authorized to set aside the firmly fixed and established rules of law because the verdict of a jury is not one which we would have returned as a juror.

Perceiving no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.

Whole court sitting. Judge Sampson dissenting.

### OPINION OF JUDGE SAMPSON—Dissenting.

I dissent from the majority opinion for the reason that I am fully convinced the trial court committed grievous errors against appellant. To my mind the verdict and judgment are unwarranted. The appellant is a negro boy who, at the time of the killing, was turning into his eighteenth year. He is uneducated and has little training that would qualify him to either understand or prepare his case for trial. His youth and inexperience, no doubt, account in part for his sudden excitement which caused him to fire the pistol which took the life of the unfortunate white man. Mr. Spears was a man of mature years. He had more education and better training because of circumstances which operate in favor of the white race and militate against the colored race, and more was expected of him in keeping the peace and upholding the law than of this ignorant boy.

The facts which led up to the homicide are recited both in the opinion on the first appeal and in the opinion in which the majority of the court concur, and from which I now dissent, and it will be unnecessary to here again relate the facts. I shall treat the facts as stated in said two opinions as a part of this dissent.

Never entertaining a very high regard for technicalities of the law, I rejoice in an opportunity to brush them aside when they interfere with the true course of justice, or attempt to intrude themselves in support of the letter of the law while ignoring and defeating the spirit and purpose thereof. The majority opinion is largely rested upon a rule of practice. There is no rule of practice but should yield to the right, no precedent so sacred, no matter how often adhered to, but should be brushed aside when it stands in the way of justice. What are rules of practice or precedent save helpful guides in the administration of the law of which justice

is the foundation? And when they cease to serve as such useful guides, or hinder its administration, let them be disregarded. Over and above rules of practice and legal precedents are the right to life, liberty and humanity to man, which is the ultimate end, equal and exact justice. In this case where an humble, unfortunate human being is about to pay the severest penalty of the law by death in the electric chair, if the judgment of the trial court is to be sustained, I am impelled to not only dissent, but to set down in a respectful and modest way the reasons for my doing so.

The gist of the evidence, which is related in the two opinions, may be stated as follows:

A colored boy, Bradley McDaniel, in the service of a white man, was required to carry harrow teeth from an automobile of his employer in the street, into the blacksmith shop of Mr. Spears. He spoke politely to Mr. Spears and after performing his errand, was respectfully leaving the shop on his way to the automobile, when Mr. Spears, wholly unprovoked and without the slightest right or justification for so doing, called to the colored boy and inquired why the colored boy had struck the son of Mr. Spears on a previous day. The negro boy, still respectful, answered, "Mr. Dee, I don't bother your boy, I attend to my own business," whereupon Mr. Spears replied, "Get out of here." The boy then started to run and got off the pavement down on the street, when Mr. Spears, who was in pursuit, threw a plank or scantling at the boy, striking the automobile, at the same time saying to the boy: "You God damned son of a bitch, I will break your neck." Spears was then advancing toward the boy in a threatening attitude. Up to this time the boy did nothing whatever to interfere with Mr. Spears, or his business, spoke no insulting or indecent language, offered no offense whatever. Spears was the aggressor. The boy only tried to get away. All this is admitted by the Commonwealth. Immediately before the shots were fired which took the life of Spears, and while he was following the boy and very near to him, and at a time when the boy says Mr. Spears was attempting to strike him with a 2x4, a deadly weapon, the boy pleaded with Mr. Spears, saying: "Mr. Dee, don't do that." Mr. Spears was a larger and more powerful man than this colored boy. While Spears was advancing on to the boy, threatening to kill him, the shots were fired, and Spears fell almost at the feet of

the boy, although his anvil and place of business were several yards away. He had pursued and abused the boy who had offered no offense and up to that moment had committed no wrong so far as this record discloses. All this happened in a very few seconds.

The right of self-defense has never been denied to man. Self-preservation is the first law of life. We may defend ourselves against the unwarranted assaults of others at all times and under all circumstances, even to the taking of human life. This the law guarantees to every human being, black or white. Under the facts in this case the colored boy, Bradley McDaniel, appears to have been within his rights; at most he can be guilty of no higher offense than voluntary manslaughter. Had he received the punishment fixed by the statute for this crime, or any punishment less than death in the electric chair, I would not seriously object to the affirmance of the judgment.

The argument may be made that in as much as the colored boy took the life of Spears he should expiate the crime by the surrender of his own life. That depends upon the facts. If the boy had the right to defend himself—and this is guaranteed to him both by the Constitution and the common law of the land—then he had the right to use such force as was necessary, or appeared to him in the exercise of a reasonable judgment to be necessary, to avert the threatened danger; and if he used no greater force than was reasonably necessary, or which appeared to him, in the exercise of a reasonable judgment under all the circumstances surrounding him at the moment, to avert the danger, real or to him apparent, then he was entitled to an acquittal at the hands of the jury, and this was true even though his hide was black and his assailant was a respectable white man. Let us turn the facts around, and assume that the colored boy was the keeper of the blacksmith shop, and Mr. Spears had carried the harrow teeth into the shop to be sharpened. Suppose Mr. Spears had carried the harrow teeth into the shop, and in a respectful manner had said: "Mr. McDaniel, where shall I put them?" and the colored boy, McDaniel, had said, "lay them down there anywhere," and as the white man left the shop the colored boy had assailed him with the same words and in the same manner that Spears assailed the colored boy, calling him a son of a bitch and assaulting him with a plank, a deadly weapon, leaving his shop and pur-

suing Spears into the street, and Spears had fired five
shots into the body of the colored boy, causing his death,
just in the same manner that the colored boy fired the
shots into the body of Mr. Spears. Who would contend
for a moment that Mr. Spears had committed murder, or
even manslaughter in the killing of the colored boy under
circumstances like these? The average grand jury
should not and would not have returned an indictment
against the white man; and if an indictment had been re-
turned, a verdict of acquittal would have been rendered
as quickly for Mr. Spears as was the verdict in this case
(twenty minutes), inflicting the death penalty upon the
colored boy.

Several minor errors were committed by the trial
court, any one of which ought to be sufficient to reverse
this judgment under the circumstances, the severity of
the punishment considered; but there is one tremendous
error at the bottom of it all—insufficiency of the evidence
which amounts to a total absence of evidence to support
a verdict of death—which is enough to overturn this or
any other verdict when a human being's life is involved.
This is the chief ground insisted upon for a new trial.
Among other grounds for new trial mentioned in section
271 of our Criminal Code, are the following: ''(a) If
the verdict be against law or evidence; (b) if from the
misconduct of the jury, or from *any other cause* the
court be of opinion that the defendant has not *received
a fair and impartial trial.*'' The verdict in this case is
against the evidence. There are only two witnesses who
testify concerning what happened at the time and just
immediately before the shooting—Lester Wright, a
white man, and the defendant Bradley McDaniel. Wright
was a respectable white man engaged in business in the
town where the homicide occurred. He corroborates the
evidence of the colored boy in almost every material re-
spect. There were several other witnesses who testify
to hearing the shots fired, to seeing the dead man after
the shooting, and to many facts which occurred after the
first shot was fired, but no one of them saw, or claims to
have seen, the beginning or cause of the difficulty, except
Miss Bessie Davis, who says she was eighty yards away
and who on cross-examination admits that she did not
in fact see the commencement of the fight. On direct ex-
amination she says that the deceased, Spears, was stand-
ing behind an automobile and she was asked, ''You could

see nothing of Mr. Spears, until he had fallen, except his feet under the car?'' ''A. Yes, sir; just enough to tell it was him.'' As she could not see any part of Mr. Spears except his feet under the automobile until after he fell, she could not tell what he was doing at the time and before the first shot was fired. This was the all important moment. What happened after the first shot was fired amounts to nothing. The shots were fired in such rapid succession that they sounded almost like a single shot, according to some of the witnesses. Reading all of Miss Davis' evidence together, it plainly appears that she was not looking at either Mr. Spears or the colored boy at the time the difficulty started, or at any time up to the time of the firing of the second shot. As it is conceded that Spears was at his anvil inside of the shop at the time Bradley McDaniel was going out of the building, and that Spears provoked the difficulty, ran after and assaulted the boy, and Spears' body was picked up in the street some twenty-five yards nearer to the automobile than where he should have been had he not provoked and brought on the difficulty, it can be scarcely contended that the colored boy was the aggressor. One of the witnesses for the Commonwealth, Gill Edwards, testifies that after the first shot was fired, he looked and saw ''Mr. Spears trying to get closer to him (McDaniel), going forward, and he fell about the time he was shot the fourth time,'' which indicates that Spears did not cease to advance until he was fatally wounded. The verdict of murder is unsupported by the evidence. This is clearly shown by a careful reading of the facts stated in the opinions to which I have referred. These facts, given their full force and effect, could entitle the Commonwealth to no greater verdict than is prescribed for voluntary manslaughter, which is from two to twenty-one years in the penitentiary.

While the assault of Spears was wholly unwarranted and was sufficient to have justified any good American in defending himself, there is another element which appears to show the injustice of the verdict. Human experience has proven that under excitement men act differently, according to their temperaments, and always with more rashness and severity than when they are composed and deliberate. Our law recognizes this, and in many cases where a plea of self-defense is made, the court instructs the jury that, if it believes from the evidence that the acts of the deceased in bringing on the

difficulty or in prosecuting the fight, were such as were reasonably calculated to and did excite the passions of the defendant beyond his power of control, or the shooting was done in sudden heat of passion or sudden affray and without previous malice, then the jury should find the defendant not guilty. This is especially applicable to cases where the difficulty comes up suddenly and unexpectedly, as in this case. Nothing had occurred between the colored boy and Mr. Spears to indicate that Spears would assault the boy. When he assailed him he did it suddenly, rashly and vehemently, exhibiting great excitement and temper, accompanying it with a show of force and violence. The boy retreated to the automobile begging, not fighting, and tried to get in the machine and get away, but before he could do so, Mr. Spears rushed upon him in such manner as was reasonably calculated to have excited the most sober and discreet youth in the land beyond his power of control, and acting under these conditions he fired the shot which took the life of Spears. Regrettable as is the death of Spears, we should nevertheless uphold the standards of the law, and give to this colored boy the benefit of the spirit and purpose of the law—the right to defend himself—and his punishment at most should be much less severe than that named in the verdict. With these facts before the trial judge, he should have granted a new trial, and in overruling the motion of defendant, he committed reversible error in my humble judgment. It is the duty of the trial court in every criminal case where the verdict is against the evidence, or unsupported by the evidence, to grant a new trial. In fact, the court may for any cause grant a new trial when it is of the opinion that the defendant has not received a fair and impartial trial. Criminal Code, section 271. That this colored boy has not received such trial is too obvious for argument. In the absence of evidence no verdict can be sustained, and all the direct and positive evidence heard by the jury is to one effect, and the Commonwealth does not attempt to gainsay it—Spears started the trouble, pursued the boy, assaulted him, hemmed him, and compelled him to fire in self-defense, without the slightest provocation, to Spears. What more could the boy have done toward averting the trouble than he did, except to suffer some great bodily harm, or death at the hands of his assailant Spears? But, this the law did not require him to do. He had a right to stand his ground and defend

himself. He was not required to retreat. The street was a public thoroughfare, open to both white and black, and the mere fact, if it was a fact, that the colored boy had slapped the white boy of Spears some days before, did not justify Spears in the assault nor excuse his conduct. The police court was sufficient to have taken care of the quarrel between the two boys, and as a law-abiding citizen, Mr. Spears, if his boy had been wronged, which is very doubtful, could have redressed the wrong in the nearest magistrate's court. From the record in this case the white boy first assaulted the colored boy, striking him with rotten potatoes.

The justly proud, powerful and intrepid white man who fills the juries, holds the offices, administers the government and controls the courts, should be more magnanimous and just to the weak and servile negro race in a land where he is domiciled, not by his wish, but through the sin of the slave dealer, than to deny him a fair and impartial trial. No one, not even the sensible colored person, wishes social equality between the races. It can not and must not be, but before the law we are all equal. Justice demands an evenly balanced scale—a square deal. If we are to vary from this rule at all, let it be upon the side of the weak rather than the side of the great and powerful. Courts and juries are chiefly needed to protect those who are unable to protect themselves. They are supposed to be a bulwark of protection for the humble and lowly; all others can conserve their own rights.

This court has reversed many judgments of conviction on the sole ground of the absence of evidence to support the verdict. Lucas v. Commonwealth, 147 Ky. 744; Crews v. Commonwealth, 155 Ky. 122; Hall v. Commonwealth, 149 Ky. 42; Edmonds v. Commonwealth, 149 Ky. 242; Commonwealth v. Ainsworth, 147 Ky. 771; Minniard v. Commonwealth, 158 Ky. 216; Taylor v. Commonwealth, 158 Ky. 772, and many more cases because of the insufficiency of the evidence, coupled with some less important error. Here we have a number of minor errors, chief among them being the failure of the court to admonish the jury concerning the effect of the evidence introduced by the Commonwealth and intended to contradict that given by Wright, the chief witness for the appellant, not to mention the error of the trial court in failing to grant appellant a continuance on the ground that the mandate of this court had not been filed and

notice given pursuant to subsection 2 of section 761, Civil Code.

Where there is no evidence to support a charge of murder although there is evidence sufficient to sustain a conviction of manslaughter, a judgment entered on the verdict of murder should be reversed. The two crimes have many distinguishing features. This boy may be guilty of voluntary manslaughter, but not of murder.

With the greatest respect for the court of which I am an humble member, I, for the reasons above assigned, dissent.