Fitzpatrick, &c., v. Commonwealth.

---

·CASE 55—INDICTMENT—NOVEMBER 17, 1883.

# Fitzpatrick, &c., v. Commonwealth.

### APPEAL FROM ADAIR CIRCUIT COURT.

1. It is no excuse or palliation for what would otherwise be a deliberate murder that the perpetrator of it is passionate, ignorant, or even of weak mind, unless the weakness of mind amounts to such a defect of reason as to render him incapable of knowing the nature and

Fitzpatrick, &c., v. Commonwealth.

quality of his act, or, if he does know it, that it is wrong to commit. it; nor is it any excuse for murder that the perpetrator has not power to control his actions when aroused or in a passion. The court in this case, therefore, properly excluded testimony tending to show that the defendants were of weak minds, and properly refused to instruct as to insanity, the testimony showing no more than that the defendants were illiterate, ignorant, and passionate men.

2.  The refusal of the court to instruct the jury as to self-defense was not error, there being no evidence that either of the defendants was in danger of loss of life or bodily harm at the hands of the deceased. Proof of the communication to the defendants of threats made by the deceased did not authorize an instruction as to self-defense, there being no evidence of any hostile demonstrations on the part of the deceased.

OWENS, MILLER, WINFREY & WINFREY for appellants.

1.  The court erred in refusing to allow the defendants to prove that they were "weak-minded."

2.  It was error to refuse to instruct the jury that the defendants were not guilty of murder unless they "knew right from wrong, and had sufficient reason and power of control to govern their actions," the proof authorizing such an instruction.

3.  The defendants were entitled to instruction on the question of self-defense.

P. W. HARDIN, Attorney General, for appellee.

Weakness of mind is no excuse for crime. The question was, whether the defendants understood at the time of the killing the quality of their act, and knew right from wrong.

CHIEF JUSTICE HARGIS delivered the opinion of the court.

On the day of the August election, 1883, at Neatsville, in Adair county, while Miller Brewster, a man about fifty years old, was there, attending as a voter, as we suppose, he was accosted by Champ Fitzpatrick, who said to Brewster that he had told a lie on him. Brewster replied that he had not; but if he had, he would take it back. Fitzpatrick then said he had been talking about him in the neighborhood. Brewster responded that he had not; but if he had, he would take it back, and did not want any trouble. Fitzpatrick then struck him in the mouth with

Fitzpatrick, &c., v. Commonwealth.

his fist or hand, and knocked his hat off. Brewster had hold of his little boy by the hand, but let go of him about that time, and picked up his hat, and put it on with both hands, and again said he did not want any trouble. Fitzpatrick then took hold of him and began striking him with a knife. He would try to get loose and get away, but Fitzpatrick would catch his hair, which was long, and jerk him and stop him, until he had cut him a number of times, and he was very bloody. At this juncture, the crowd having gathered up about them excited, some saying "part them," and others exclaiming, "let them fight," Rude Fitzpatrick, a married man, and the brother of Champ Fitzpatrick, rushed up, having run about one hundred yards, and shot Brewster just below the nipple, the ball passing through and lodging under the skin of his back. He sunk down, and then Champ Fitzpatrick walked around and shot him in the head above the ear while he was resting with his elbow on the ground and his head on his hand. He then fell flat on the ground, and quickly expired. He made no resistance whatever. He did not strike, or offer to strike, to save himself from that ignominious and bloody death.

The appellants, Champ and Rude Fitzpatrick, were indicted for the murder of Miller Brewster, and, upon their joint trial, the evidence disclosing the facts stated, and some others which will be noticed hereafter, they were found guilty, and their punishment fixed at death.

From a judgment upon the verdict, sentencing them to be hanged on the 7th day of December, 1883, they have appealed, and their counsel insist that the court erred in excluding competent evidence from the jury, in failing to properly instruct them, and by overruling a motion for new trial.

It is not pretended by counsel, in argument, that either of the appellants is insane; but it is insisted that the court erred in not allowing Samuel Bryant, a witness introduced by the commonwealth, to answer, on cross-examination, this question: "Are the defendants strong or weak-minded?"

It was avowed that the witness *was expected* to answer that "both of defendants were weak-minded." The witness was allowed to state, and he did state, "he had known defendants all their lives; they have little or no education; have gone to school, but don't think they ever learned very much; don't think they have power to control their actions when aroused."

Whether this witness would have stated what was *expected* is not material, in view of his subsequent explanation of the facts, which were much more important than the opinion that defendants were weak-minded.

This effort to get before the jury the opinion of another witness, W. F. Neat, that the defendants were weak minded, was prevented by the ruling of the court; but Neat testified that "he had taught school in the neighborhood where defendants were raised, and both of them have gone to school to me, and I could never learn either of them very much, if anything."

The attorney for the defendants put the question in this form: "State if or not defendants are of *sound mind*, or are they not *weak-minded* men." The court sustained an objection to it, evidently because the question embraced the last clause, and this is shown from the fact that the witness was allowed to state "that he did not think that the defendants, or either of them, had or have power or reason sufficient to control their actions *when aroused*. Perhaps they know right from wrong in some things, and in others they would

not, and when *in a passion*, don't think they have sufficient reason or power to control their actions."

There is no law which will excuse or palliate a deliberate murder on the ground that the perpetrator of it is unlearned, passionate, ignorant, or even of weak mind, unless the weakness of mind amounts to such a defect of reason as to render him incapable of knowing the nature and quality of his act, or, if he does know it, that he does not know it is wrong to commit it.

It is no excuse for murder that the perpetrator has not power to control his actions when aroused or in a passion. It is the duty of men who are not insane or idiotic to control their evil passions and violent tempers or brutal instincts, and if they do not do so, it is their own fault, and their moral and legal responsibility will not be destroyed or avoided by the existence of such passions, or by their conduct resulting from them.

There is no evidence in the record that would raise a doubt of the sanity of the appellants.

They were grown men, one of them married, the other (Champ) a farmer, who worked on or near the same place that Brewster worked on. He was passionate, and threatened to tap Brewster over for so small a matter as a suggestion about fixing a broken plow, and, some days before the election, he said he would kill Brewster that day, if he did not do it before. He had sense enough to do all these things, and to go to the election armed, as both of them were, and on the cunning and overbearing pretext that poor Brewster had lied on him, or talked about him in the neighborhood, began the unresisted and deadly assault upon him, which ended with the destruction of his life in the presence of his little boy.

It is true that it was proven that for twenty-five cents he swallowed a live young rat on one occasion, and a mouse at another; but this evidence, instead of showing irresponsible insanity, tended to establish the bad passions which were essential to the perpetration of such a deed. The most that can be inferred from the evidence above alluded to and quoted, which is all there is upon insanity or weakness of mind, is, that the appellants were illiterate, ignorant, and passionate men, and we think the court did right in excluding the evidence which was expected to be given in response to the questions as to the supposed weak minds of the appellants, and also in refusing to instruct the jury on the question of insanity; for there was no plea of that kind seriously relied on, and no appreciable evidence to support it. It is complained that the court refused to give any instruction on the question of self-defense. In this we think the court did right likewise, because there is not a shadow of evidence by any witness for or against the appellants that they, or either of them, were in the slightest danger of loss of life or bodily harm of any kind at the hands of Brewster, as the above recital of the facts conclusively demonstrates.

One witness testified that Brewster took a step towards Champ Fitzpatrick while the latter was assaulting him. If he did, the evidence shows it was because Fitzpatrick would jerk him back by the hair of the head as he struggled to get away from him, and certainly this portended no danger to the appellants, or either of them. Their brother testifies that Brewster told him on the morning of that fatal day "that if Champ was there he had better tell him to leave, or he might be carried away dead; and he told his brother of this interview before the fight."

Even if he did communicate such a threat, that of itself, as this court has held, if it were the .threat of the most desperate and lawless man, furnishes no excuse for taking his life; and there is no evidence that any hostile demonstrations or wish had been made or existed on the part of Brewster, before or at the time he was slain, towards the appellants, or either of them; and it is a misnomer to call the unrelentless destruction of the life of Brewster a fight. It was not a fight; and the facts and circumstances did not authorize an instruction on the question of self-defense, and the court, as we think, did its duty in refusing to give such an instruction.

The court correctly instructed the jury on the question of murder, manslaughter, and reasonable doubt; and as the real question in this case has been fairly tried, and the verdict of the jury is sustained by the evidence, we have no power or inclination to disturb it.

Wherefore, the judgment is affirmed.