## Howard v. Commonwealth.

(Decided April 27, 1928.)

Appeal from Jefferson Circuit Court (Criminal Branch).

1. Homicide.—Where defendant prosecuted for murder admitted killing deceased and testified that he passed engine house at time referred to in testimony of police officer, admission of testimony which court held was not competent but failed to instruct jury to disregard, by officer as to statements of deceased not in presence of accused, only portion of which that could be prejudicial was hearsay statement of deceased as to identity of accused when passing engine house, was not prejuicial.

2. Homicide.—Ungovernable passion does not constitute insanity.

3. Homicide.—Jealousy or sudden anger by accused, provoked by knowledge that accused had been abandoned by his mistress, held no excuse for murder of mistress.

4. Homicide.—Testimony that defendant charged with murder killed deceased, who was his mistress, in fit of anger, held not to show insanity or to show facts from which insanity could be inferred, and hence court properly refused instruction based on defense of temporary insanity.

JOHN D. CLAUSEN for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Rees—Affirming.

The appellant was convicted of the crime of willful murder and his punishment fixed at death. He was found guilty of having killed Lucy Buckner, his mistress, by stabbing her in the breast. The only grounds relied on for reversal are alleged errors in the admission of testimony and failure of the trial court to give an instruction on insanity.

The appellant and Lucy Buckner, though not married, had been living together for several months preceding the homicide, which occurred about 6:30 a. m. on April 17, 1926, in the yard in front of the home of W. H. Robinson on Everett avenue in Louisville, where Lucy Buckner worked as a domestic. The evidence for the commonwealth in substance is that on the night before the homicide Lucy Buckner went to the home of her aunt, Ella Wesley, and had been there but a short time when appellant appeared and became angry because she was talking to a man by the name of Brown who roomed at the Wesley home. Appellant struck the woman, and John Wesley, Lucy's uncle, ordered him from the house. Appellant returned in a few minutes and asked her to go home with him, which she refused to do, and he said: "If you don't come I had better not see you on the street to-morrow." A few hours later appellant met Ed Jacobs on the street and told him what had occurred at the Wesley home, and further said that he intended to kill Lucy Buckner. Jacobs remonstrated, and appellant said: "I never promised any one a killing that I didn't give it to them." On the same night he made a similar threat in the presence of Willie Eurkes. Early the next morning Lucy Buckner started to the home of her employer, and she had gone but a short distance when she discovered the appellant following her. She ran to a building occupied by the fire department, where a policeman was standing, and remained there until appellant had passed. She later proceeded toward her destination, but before arriving she again saw the appellant, and she ran in the direction of the Robinson home with appellant in close pursuit, her screams attracting the attention of a number of persons passing along the street. He overtook her in the Robinson yard and stabbed her three times. He then ran and was later arrested in Atlanta, Ga.

Appellant testified in his own behalf, no other witness being introduced by him. He testified in substance that he and Lucy Buckner had been living together about 12 months. On the night preceding the homicide she went to the Wesley home, and he followed her there and found her and Coleman Brown in a room under circumstances that induced him to believe they had been guilty of illicit relations. He became angry and struck her and was ordered from the house by John Wesley. He denied making the threats testified to by Jacobs and Eurkes, but admitted he saw Lucy Buckner on the street the following morning and followed her to the Robinson home. He claimed they were to be married on Sunday following the homicide, that he had given her $10 with which to purchase a marriage license, and that he went to the Robinson home intending to effect a reconciliation; but, in response to his request that their relations be resumed, she refused and likewise refused to return the $10 he claimed to have given her, whereupon he stabbed her.

The only evidence pointed out as prejudicial is that of James Lax, a policeman, and a witness for the commonwealth who testified to statements made by the deceased on the morning of the homicide and not in the presence of the accused. Upon objection being made, the trial judge ruled that this testimony was not competent, but it is insisted that since he failed to instruct the jury not to consider it, its admission was prejudicial error. That the total lack of merit in this contention may be shown we quote in full the testimony complained of:

"Q. Were you in the neighborhood of No. 5 engine house, on First and Liberty, on the morning of the 17th of April of this year? A. Yes, sir.

"Q. Did you see this defendant here, or Lucy Buckner, who was killed? A. I saw both of them.

"Q. And what were they doing? A. She came about a quarter after 5—she came running in the door of the engine house like she was scared to death, and we run to the door and asked her what was the matter.

"By Mr. Briel: Objected to.

"Q. Was he present? Where was he? A. No; he was a half block or more from her.

"Q. She came in scared, and what did you all do; anything? A. She wanted us to go with her to her room to get her clothes, and we were standing there

talking about going to the room, and he came walking up, and he turned in the corner, in First street I believe, and that was the first and last time I ever saw him; we went to her room to get her clothes, and we couldn't get them—couldn't get in, and she told us his name was James Howard.

"By Mr. Briel: We object to what she told him.
"By the Court: That is not competent."

The only portion of this testimony that could be prejudicial under any supposed state of facts is the hearsay statement of the deceased as to the identity of the accused. The appellant admitted the killing and testified that he passed the engine house at the time referred to in the testimony of the police officer. The testimony complained of therefore was in no respect prejudicial to appellant's rights.

Insanity was not relied on as a defense, and no evidence was introduced in appellant's behalf tending to show that he was insane at the time of the commission of the crime, unless it can be inferred from his own testimony. It is insisted that his testimony discloses that by reason of a jealous frenzy he was temporarily insane and did not know right from wrong, but acted under the influence of an irresistible impulse, and that it therefore became the duty of the trial court to submit to the jury by proper instruction the question of the mental condition of the appellant and thus submit to the jury the theory of the defense. The only portion of appellant's testimony from which any inference could possibly be drawn that he was insane at the time the crime was committed is as follows:

"Q. Did she say she wasn't going to marry you? A. She wasn't going to marry me after that, and she wasn't going to give the money back.
"Q. Did you ask her to come back home? A. Yes, sir.
"Q. What did she say? A. She told me she wasn't coming back.
"Q. What did you do then? A. Well, me and her got into an argument, and in a desperate passion I stabbed her.
"Q. How many times did you stab her? A. I stabbed her twice to my knowing, but I read the paper and it says three times; I don't know exactly how many times.

"Q. You don't know how many times you stabbed her? A. No, sir.

"Q. Why did you stab her? A. Well, I don't know exactly altogether; I wasn't to myself.

"Q. What do you mean, 'You wasn't to yourself?' A. Well, I had been drinking some that night, but of course I don't know just the effect of it.

"Q. Did you have anything to drink before you went up after Lucy at the time you caught her in Brown's room, and did you take your drinks after they put you out of Wesley's home? A. I taken the drinks after they put me out of the house.

"Q. After they put you out Lucy refused to go back home with you? A. Yes, sir.

"Q. And broke off your engagement? A. Yes, sir.

"Q. Well; at the time that you met Lucy you began to persuade her to go back home with you, did you not? A. I tried to persuade her to go back home with me.

"Q. You got mad and excited? A. I wasn't mad at the time.

"Q. I didn't hear you? A. I wasn't mad or excited at the present time.

"Q. You just got into a little argument, did you? A. Yes, sir."

This testimony only reveals that appellant in a fit of anger killed the deceased. There is no evidence that he was suffering from any mental disease, and it is only claimed that by reason of a jealous frenzy he became temporarily insane and acted under the influence of an irresistible impulse.

Ungovernable passion does not constitute insanity. A paroxysm of jealousy or sudden anger provoked by the knowledge that the accused had been abandoned by his mistress, the object of his lustful affections, is no excuse for the crime. It is the duty of one whose will power is not impaired by disease to govern and control his passions. Fitzpatrick v. Commonwealth, 81 Ky. 357, 5 Ky. Law Rep. 363. In McCarty v. Commonwealth, 114 Ky. 620, 71 S. W. 656, 24 Ky. Law Rep. 1427, this court said:

"It must be the contention of appellant's counsel, that any impulse that at the time may be irre-

sistible, will excuse homicide. Happily for society, this is not the law; otherwise an ungovernable temper, or violent, brutish passion, or frenzy caused by indignation or anger, or drunkenness, or altercation, would excuse such one. Only persons insane, or who have never reached years of discretion, are not accountable for the commission of crime. Even then the insanity that excuses is such as deprives the person committing the act of his reason or will in that particular transaction. The irresistible impulse recognized by the law is that only resulting from mental disease—from the derangement of the mind caused by a disease of the mind. It is not material how recently the derangement may have occurred. A person acts under an insane, irresistible impulse when, by reason of the duress of mental disease, he has lost the power to choose between right and wrong, to avoid doing the act in question, his free agency being at the time destroyed.''

There being no evidence tending to show that appellant was insane at the time of the commission of the crime, or from which it could be inferred that he was insane at the time, the court did not err in failing to give an instruction presenting such a theory of the case. The appellant has been given the severest penalty known to the law, but a careful examination of the record discloses no ground upon which the judgment should be disturbed.

Judgment affirmed.