## Hutsell v. Commonwealth.

(Decided June 22, 1928.)

### Appeal from Oldham Circuit Court.

1. Criminal Law.—Court is authorized to grant change of venue, if it appears that fair trial cannot be had by accused in county where prosecution is brought.

2. Criminal Law.—One applying for change of venue has burden of showing that he cannot reasonably obtain fair trial in that county.

3. Criminal Law.—In prosecution for murder, where defendant moved for change of venue and testimony of twelve or more witnesses was heard, only two or three of whom expressed opinion that defendant could not obtain fair trial in county, held, that court did not abuse its discretion in denying change of venue.

4. Criminal Law.—Ruling of trial judge on application for change of venue will not be disturbed on appeal, unless abuse of discretion is shown.

5. Criminal Law.—In prosecution for murder, where homicide occurred on May 29, 1927, and trial did not occur until July 18th, and witnesses were few, and none of them lived any great distance from county seat, all of whom testified, except a sister-in-law of defendant, held that refusal to grant continuance was not error especially, since defendant himself gave no excuse for killing.

6. Homicide.—In murder prosecution, where defendant. who killed man and wife, stated he had received threats of their intention to do him bodily harm, evidence given by defendant alone, that he "lost his mind," held not to warrant instruction on momentary insanity.

7. Homicide.—To authorize instruction on insanity, there must be some evidence of diseased mind, more than violent, uncontrollable desire to kill, and if in state of anger one takes life of another, he is not excusable on ground of insanity, but in order to justify instruction on point, there must be same derangement or disease of mind.

8. Homicide.—In prosecution for murder, where defendant shot and killed husband and wife, who came across river to sell fish, evidence held to warrant verdict of jury inflicting penalty of death.

EUGENE MOSLEY for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Asistant Attorney General, for Appellee.

OPINION OF THE COURT BY COMMISSIONER WHEELER—
Affirming.

On Sunday afternoon, May 29, 1927, the appellant, Ivan Hutsell, shot and killed John Ditchler and his wife, Jesse Ditchler. He was indicted for the murder of Jesse Ditchler at a special term of the Oldham circuit court on July 5, 1927, tried on July 18th, found guilty, and his punishment fixed at death. He appeals.

The Ditchlers lived in Indiana on the Ohio river opposite Westport, Ky. The appellant lived at Westport on the Kentucky side of the river. It appears that bad feeling existed between the appellant and the Ditchlers At one time the appellant and John Ditchler had a fight, and at another time the appellant, according to his testimony, was driven from the premises of Jesse Ditchler, where he had gone for the purpose of removing his furniture from a tenant house he had occupied when Jesse Ditchler cursed him and shot at him.

Later appellant was prosecuted in the courts of Indiana by Jesse Ditchler and her husband, resulting in a conviction and sentence to the penal farm in Indiana, where he served until January, 1927. He remained for a short time in Indiana, and then moved to Westport, Ky. On the day of the homicide and just before its occurrence, some one from the Kentucky side called to Lon Smith on the Indiana side of the Ohio river to bring over some fish. The Ditchlers operated a motorboat on the Ohio river, and, on the call being made for the fish, Smith, accompanied by a Miss Conn (sister-in-law of the appellant), John Ditchler, and Jesse Ditchler, came over in a motorboat to the Kentucky side. It is testified that the appellant is the one that called Smith, but he denies

it. He admits, however, that before the arrrival of the motorboat, he left the landing and went up to his home, armed himself with a single barrel breech-loading shotgun, and came back to the landing where he awaited the arrival of the boat. The boat was operated by John Ditchler, and, when it landed, Miss Conn and Mr. Smith got out of the boat, both the Ditchlers remaining in it. The appellant at close range shot and killed John Ditchler in the boat. He reloaded his gun, shot and killed Jesse Ditchler, then reloaded it and fired into her dead body. He then climbed into the boat where his victims lay, and using the gun as a club, struck the decedent, Jesse Ditchler, on the head, crushing her skull. He then went to a telephone station, called up the sheriff, and told him "he had got him a man" and to come and get him. The appellant was arrested by the sheriff on the evening of the homicide, placed in the Oldham county jail, where he was confined until his trial and conviction, after which he was removed to Eddyville.

The circuit judge called a special session of the Oldham circuit court on July 5, 1927, for the purpose of investigating the homicide, and impaneled a grand jury. which returned the indictment against appellant. The case was then called for trial, but, at the suggestion of appellant's counsel, was postponed until July 12th. On that date the case was again called for trial, but was again postponed, as requested by counsel for appellant, because of his inability to be present at the trial because of serious sickness in his family, and set for trial on July 18th. The trial was then had with the result as stated.

In his motion and grounds for new trial the appellant made several complaints, but in his brief on this appeal all are abandoned, except the following: (1) That the court should have granted change of venue from Oldham county; (2) that the court should have continued the case to a later date to give the defendant more time to prepare his defense; (3) that the court should have instructed the jury on "momentary insanity"; (4) that the evidence is not sufficient to authorize the verdict or judgment thereon.

The court is authorized to grant a change of venue, if it appears that a fair trial cannot be had by the accused in that county. The appellant filed his motion for a change of venue, accompanied by the two affidavits as the law required. The motion was set for trial, and the testimony heard was reported by a stenographer and appears in the

record. Twelve or more witnesses testified, but only two or three expressed an opinion that the defendant could not obtain a fair trial in Oldham county, while the others were of the opinion that a fair trial could be had by the defendant. The court overruled the motion for a change of venue, which ruling was fully justified by the evidence. The burden was on the applicant to show that he cannot reasonably obtain a fair trial. The trial judge heard and saw the witnesses, doubtless knew them personally, and was in a better position to give proper weight to the testimony than any other tribunal, not having like opportunities. It is well settled that rulings of the trial judge on an application for a change of venue will not be disturbed, unless an abuse of discretion has been shown, and we are satisfied in this case that the trial court properly disposed of the motion. Stroud v. Commonwealth, 160 Ky. 503, 169 S. W. 1021; Mansfield v. Commonwealth, 163 Ky. 488, 174 S. W. 16; Heck v. Commonwealth, 163 Ky. 518, 174 S. W. 19; Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665. Also Combs v. Commonwealth, 160 Ky. 386, 169 S. W. 879; Dilger v. Commonwealth, 88 Ky. 550, 11 S. W. 651, 11 Ky. Law Rep. 651; Wilkerson v. Commonwealth, 88 Ky. 29, 9 S. W. 836, 10 Ky. Law Rep. 656, and cases cited therein.

Appellant cites the case of Johnson v. Commonwealth, 32 Ky. Law Rep. 1117, 107 S. W. 768, but it will be seen that defendant there was threatened with mob violence, that a secret order in the county was threatening violence to the defendant, and, further, that the decedent had a large relation in the county, many of whom were indignant and wrought up over the killing. Under the circumstances there shown, this court concluded that a change of venue should have been granted the defendant. But no such state of case existed here. The decedent lived in another state and had no relations in the state of Kentucky. No threats of mob violence were shown and no indications of any feeling whatever against the accused. The petition which was circulated and signed by residents of the county merely requested a special term of court that proper investigation and a trial might be had. This was not prejudicial to the rights of the defendant, but indicated only that the signers were desirous that a lawful investigation and legal trial should be had. If the feeling had run high, and the people worked up to a state of unreasonable excitement, leading to a demand for the life of the defendant without trial, a different state of case would be presented. We are

likewise cited to the case of Anderson v. Commonwealth, (Ky.) 117 S. W. 364, where an officer of a bank was tried and it was shown that another bank had recently failed, affecting the finances of a large proportion of the resident jurors in the county, the stockholders being made up largely of the farmers throughout the county, and under such state of case, this court held that it was proper to grant a change of venue. The facts are in no wise similar to those shown in this case. The court did not err in overruling appellant's motion for change of venue.

2. Appellant insists that the trial court should have granted him a continuance to give him more time to prepare his defense. It will be observed that the homicide occurred on May 29, 1927, and the trial did not occur until July 18th; the witnesses were few and none of them lived any great distance from La Grange, the county seat. All the witnesses having knowledge of the killing, except a Miss Conn (sister-in-law of defendant), testified and it is nowhere stated that she would have testified differently if she had been present. We are not furnished with any material facts that appellant could establish if given further time, and we are confronted with the testimony of the appellant himself, who gives no excuse for the killing. The testimony of the appellant, hereafter mentioned, illustrates clearly that the appellant had ample time to assemble whatever testimony he had, and the court did not err in overruling the motion for continuance. McQueen v. Commonwealth, 224 Ky. 89, 5 S. W. (2d) 487, and cases therein cited.

3. We have carefully examined the instructions and find that they present the whole law of the case. They were more favorable to the defendant than the facts warranted.

The only evidence offered by the defendant that could serve as any basis for an instruction on "momentary insanity," as contended for, is his own testimony. He described the state of feeling existing between himself and the deceased, Jesse Ditchler, and her husband, John Ditchler; stated that he had, prior to the killing, received threats of their intention to do him bodily harm. In speaking of the deceased and her husband coming across the river from the Indiana side to the Kentucky shore where the killing occurred, he testified as follows:

"(60) At the time you saw this boat coming across the river, did you or not recall the statements that had been conveyed to you in the way of threats

of these parties against your life? A. Yes, sir; it all come to my mind.

"(61) What did you do then? A. Well, I went home and got my gun.

"(62) Did you believe at the time that your life was in danger? A. Well, I did; yes, sir.

"(63) Now, what happened after they had practically reached this side of the river, tell this jury? A. I went home and got my gun, and went back to the river with the intention of not letting him slip up on me and shoot me, and I sat down on a fish boat, and they came into the shore in front of me, I judge 30 or 40 feet; when they headed into the shore Ditchler raised up with a pistol in his hand; I didn't give him a chance to use it, because I knowed he would use it; after the first shot, '*I kinder lost my mind; seemed like a dream more than anything else.*'

"(64) Did you, at the time of going down there, have any harm against Mrs. Ditchler? A. Not a bit on earth.

"(65) After the first shot was fired, what happened to you? A. *Just kinder lost my mind.*"

No other evidence was introduced having any tendency to show that the defendant was insane at the time of the killing of Jesse Ditchler, and he merely says that after the first shot he "*kinder lost his mind.*" But it is insisted by the appellant in his brief that the fact of appellant carrying from the scene of the killing a gun with the stock broken affords some evidence of insanity, as a broken gun would furnish no defense if he had been attacked. We see no merit in this contention, as illustrating the sanity or insanity of the defendant. His carrying or leaving the gun was no evidence of any impairment of his mind. That he chose to take it with him was no more than any sane person might have done.

In the case of Fitzpatrick, etc., v. Commonwealth, 81 Ky. 357, 5 Ky. Law Rep. 363, where the defendants asked a like instruction, this court said:

"It is no excuse for murder that the perpetrator has not power to control his actions when aroused or in a passion. It is the duty of men who are not insane or idiotic to control their evil passions and violent tempers or brutal instincts, and if they do not do so, it is their own fault, and their moral and legal responsibility will not be destroyed or avoided

by the existence of such passions, or by their conduct resulting from them."

There is no evidence in this record casting any doubt upon the sanity of appellant.

In McCarty v. Commonwealth, 114 Ky. 620, 71 S .W. 656, 24 Ky. Law Rep. 1427, a like instruction was asked by the appellant, and this court stated the law to be as follows:

"If defendant's mind was 'free from disease, then no impulse to shoot' the deceased, 'no matter how violent, and no matter how completely it dominated his will, was unsoundness of mind,' so as to excuse the homicide."

In the case of Howard v. Commonwealth, 224 Ky. 224, 5 S. W. (2d) 1056, decided April 27, 1928, a like instruction was requested for the defendant where no testimony had been offered concerning the insanity other than the defendant's own statement describing the killing of his mistress. He was asked this question:

"Why did you stab her? A. Well, I don't know exactly altogether; *I wasn't to myself.*"

It was held that the defendant was not entitled to an instruction on insanity, on the testimony offered, as he was entitled to such an instruction only when it was proven that some mental disease or unsoundness of mind existed, and the court said:

"Ungovernable passion does not constitute insanity. A paroxysm of jealousy or sudden anger provoked by the knowledge that the accused had been abandoned by his mistress, the object of his lustful affections, is no excuse for the crime. It is the duty of one whose will power is not impaired by disease to govern and control his passions."

It will be seen that to authorize an instruction on insanity there must be some evidence of a diseased mind; something more than a violent, uncontrollable desire to kill; and if in a state of anger one takes the life of another, he is not excusable on the ground of insanity. In order to justify an instruction on the point, there must be some derangement of, or disease of, the mind. It is not shown in this record, and the appellant has no just ground of complaint, that the court did not instruct the jury on "momentary insanity."

4. It is lastly contended by the appellant that the evidence is not sufficient to warrant the verdict or to sustain the judgment. The eyewitnesses, except Miss Conn, testified at the trial, and we do not know her version of the killing. The other witness, Lon Smith, who was in the boat with decedent, testified that he and the deceased, Jesse Ditchler, and her husband, John Ditchler, were on the Indiana side of the Ohio river; that he, having fish to sell, came over on the Kentucky side in response to a call to bring over some fish; and that John Ditchler operated a motoboat at that place, and that he had no other means to bring the fish over except in the motorboat with Mr. and Mrs. Ditchler, as he did; that a Miss Conn, sister-in-law of the defendant, and no other person, came with them. When they reached the Kentucky shore, appellant appeared with a gun and committed the crime for which he was convicted.

Dr. W. W. Kemper was there and saw the shooting, and described the circumstances and events to the same effect. Others were close by and corroborated in many respects the testimony of these two witnesses. Dr. Kemper stated that a party of friends who came there with him were up the river in a new motorboat, and he remained on the river bank near the landing, and after hearing the call to come over the river, he saw the appellant, with a gun in his hand, coming towards the scene of the tragedy. He also saw him go in the house and come out in a few minutes with the gun. His testimony then proceeds:

"Q. Have any conversation with you? A. yes, sir.

Q. State what he said. A. He asked me where my 'pals' were; I said, 'Up the river;'" he said, 'Call them;' I asked him what was the trouble; he again asked me where they were; I told him they were up the river; he said 'All right; they will be safe;' I says, 'Man, what is the trouble?' He said, 'They will be out of the way then;' but he asked me the question as to the kind of boat, and I told him, and he went away muttering 'new boat.'

"Q. Where did he go? A. Went down the river.

"Q. Toward the landing? A. Yes, sir.

"Q. How long was that before the shooting? A. Possibly ten or twelve minutes, maybe longer, I couldn't exactly say the time. . . .

"Q. From the time the defendant had this conversation with you, and asked you about your 'pals,' and he went on down toward the landing, did you see where he went? A. Yes, sir.

"Q. Where did he go? What did he do? A. He went on down and sat down up above the landing a little while, then he went down and moved up behind some willows, then he came back down and sat some distance from the landing; that was the last time I saw him, until the shooting occurred.

"Q. Was he still armed at that time? A. Yes, sir.

"Q. How far did you say he was from the regular landing at Westport when he sat down? A. Twenty or thirty feet.

"Q. Did you observe what happened at the landing, after the first shot? A. Yes, sir.

"Q. State to the jury exactly what you saw. A. After the first shot, I made the remark to my wife, 'I wonder if that crazy fellow had killed some one.' I saw Mr. Arnold and his wife and children coming up the bank; at that time he was about thirty feet from the boat with his gun, reloading it, about that time the second shot had been fired.

"Q. What was the effect and at whom were the first and second shots fired, if you know? A. I think the first shot hit the boat; the second shot, I think, was the one which shot Mr. Ditchler, in the boat.

"What position was John Ditchler in in the boat at that time? A. Down on his face trying to protect himself.

"Q. Where was Jesse Ditchler? A. Toward the middle.

"Q. What was her position? A. She was sitting up in the boat.

"Q. Did you observe any other shots fired toward the boat? A. There were two others.

"Q. At whom were they fired, if you know? A. I don't know exactly, but I presume Mrs. Ditchler.

"State to the jury what you saw there after that. A. I was helping Mr. Arnold get in the car and start to running the car when the third shot was fired; we had started to get them; I noticed Miss Conn lying across the fence; I picked her up and put

her in the car; that is when I noticed the fourth shot fired and he stepped around the side of the boat.

"Q. What did he do? A. Using the butt of the gun.

"Q. What did he do? A. He was hitting Mrs. Ditchler over the head.

"Q. What way was he hitting her? A. He took hold of the front end of the gun and used it as a club.

"Q. Is this the gun that you saw him have that afternoon A. It resembles it."

It will be seen from the testimony quoted, and giving full weight to the version of the homicide as detailed by the defendant, that no reason or excuse is shown for the commission of the crime. We have examined the record with extreme care, and have found no instance where the trial court failed to give to the defendant everything to· which he was entitled under the law. The penalty inflicted is the most severe known to the law, but we cannot say that the acts of the defendant under the circumstances detailed in this record did not fully justify the jury in arriving at the verdict it did, and as no prejudicial error was committed by the court the judgment must be affirmed.

Whole court sitting.