## Tincher v. Commonwealth.

(Decided Jan. 19, 1934.)

624

. T. K. SHUFF, Jr., JESSE McKNIGHT and GEORGE R. SMITH for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The grand jury of Scott county jointly indicted appellant, George W. Tincher, and Francis Glenday, Isaac Swanagan, Jimmie Tincher, and Lonnie Harvey, accusing them of the crime of willfully murdering Ben Keenon. The first count in the indictment charged each of the accused as a principal in the crime. The second one charged that Francis Glenday fired the shot resulting in Keenon's death, and that the other defendants, including appellant, were present aiding and abetting; while the third one charged a conspiracy by the five conspirators to rob a bank located in Stamping Ground in Scott county, and pursuant thereto they did rob it, and that during the progress of the robbery, "and in pursuance of said conspiracy to rob said bank and in pursuance of said robbery the shot was fired by Glenday and that appellant was present aiding, abetting, encouraging and advising him to do so." The indictment embraced the necessary terms to constitute murder, such as "malice aforethought," etc.

Appellant's demurrer thereto was overruled, and on his motion he was given a separate trial at which he was convicted and punished by death. From the verdict and the judgment thereon he prosecutes this appeal, and by his counsel urges two grounds for reversal, which are: (1) Error in overruling appellant's (who will hereinafter be referred to as defendant) demurrer to the indictment; and (2) error in giving and refusing instructions. The latter one is subdivided in briefs into four heads, but they all relate to, and are embraced in, that general ground. We will dispose of the two general grounds in the order named.

1. In the argument of counsel in support of ground 1, it is contended that the indictment is duplicitous be-

cause in its accusatory part it prefers only the charge of murder, while in its descriptive part in some of its counts it not only charges a conspiracy, which counsel seem to conclude is a distinct offense, but it also sets out the object and purposes of the conspiracy, which was to rob the bank, and which counsel seem to be convinced is a distinct offense. However, it is our conclusion that the mere statement of the contention is sufficient to refute the argument. The facts were that the conspiracy was formed to perpetrate the robbery and which it was eminently proper should be stated in the indictment, as it was also proper that the killing should be charged to have resulted from some act committed in pursuance to the execution of that conspiracy. In counsels' brief they positively state that there was no such allegation in the indictment, but the above quotation therefrom absolutely contradicts that position, since it is expressly stated therein in more than one place that the killing of Keenon by Glenday was not only during the progress of the robbery, but "in pursuance thereof," and, in substance, a part of it. The testimony conclusively shows, and which was admitted and confessed by defendant while on the stand, that the conspirators (defendants in the indictment) met some days before the robbery, which was on the afternoon of November 28, 1932, and determined to rob the bank. They stole an automobile for the purpose of familiarizing themselves with the situation beforehand, and for a like purpose with reference to another bank that they had in mind to also rob. Defendant also admitted that he, Glenday, and Swanagan robbed a bank at Morefield, Ky., some few days before conspiring to rob the Stamping Ground bank. In other words, the testimony shows, without any objection thereto (and which was admitted by defendant in his testimony), that the crowd, with perhaps the exception of Willie Tincher and Lonnie Harvey, had been engaged in the business of bank robbery. Defendant also confessed or admitted that some time about the 1st of August of the same year he finished serving a term in the penitentiary in California, but he did not state for what offense.

The plan of the robbery was carefully prepared, and all of the testimony in the case, except that of defendant, was to the effect that he was the moving spirit and the dominant figure in all of the arrangements and in their punctilious execution, even to providing for the pistols and where each of the conspirators should be

located while the robbery was going on; and it was he who first entered the bank with pistol in hand and demanded the holding up of the occupants' hands and the turning over to him of the money. It was he who gathered the money and put it into the receptacle while all of the inmates were holding up their hands, including a customer, except Keenon, who was sitting at his desk making some sort of calculation. While defendant was so engaged, with Keenon only a short distance from him and who had not held up his hands, Glenday, pursuant to instructions from defendant, was standing in the back door opening into the space behind the counter in the bank when he shot Keenon through one arm near the shoulder, severing a small vein, from which he bled profusely. Immediately thereafter the two conspirators who had entered the bank (two of the others being in the automobile at its front, and the fifth one standing in the entrance door) all got into the automobile with their loot and drove away. They came towards Frankfort, and later divided the loot between them, defendant making the division. They then scattered, and later met in Covington, Ky., but, before the robbery, the first automobile stolen by them was wrecked or in some manner became unfit for use, and they conscripted another one by hiring a taxicab driver to take them out of Covington, and subsequently putting him out and taking the car away from him, and it was the latter one they employed in perpetrating the robbery. During the course of their preparation for the robbery, they likewise feloniously took some Kentucky automobile plates from some one along the route and put them on the taxicab, which seems to have borne the license of the state of Ohio.

Upon departure, defendant commanded all of the inmates of the bank to go into the vault, which they did, and he attempted to close the door and lock it, but the lock failed to catch because of the fortunate presence of an electric wire between the door and the apperture, and but for which the occupants would have been locked in the vault. The general statement of the facts which we have outlined is made for the purpose of a clearer understanding of this and the second ground to be considered. It clearly shows that it was impossible to either state or prove the offense charged without going into all the facts forming the conspiracy and its execution, and which proves that all of them were done and performed in pursuance thereto and as a part of it. It is

useless for us to devote time or space in an effort to establish the proposition that a crime may be directly charged against the defendant in the indictment, or that it was perpetrated through and by a conspiracy either to commit that particular one or another one in the performance of which the crime charged was committed in the prosecution of the conspiracy and in carrying out its object and purpose. That it is proper to do so, not only in the indictment but also competent to prove such facts at the trial, is too elementary to need discussion. Therefore we have no trouble in concluding that ground 1 is entirely without merit.

2. Ground 2 is subdivided in argument into (a) that the court erred in not instructing the jury upon manslaughter and other lower degrees of murder; (b) that it was error not to admonish the jury of the purpose for which the stealing of the two cars and the Kentucky license was admitted, although no objection was made to any such testimony at the time it was given; and (c) that the court did not "leave the jury in its instructions to decide whether or not the shooting of Keenon by a member of the conspiracy (Glenday in this case) naturally flowed from and was done in furtherance of the common design." We will now direct our attention to these subdivisions and other criticisms of the instructions.

In an effort to establish subdivision (a), the cases Hunter v. Commonwealth, 171 Ky. 438, 188 S. W. 472; Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146, and others cited in the latter (Frasure) case are relied on. They announce the rule that in murder trials, where there was no eyewitness to the commission of the homicide, and where there was evidence of a struggle, it is the duty of the court to give all the law appertaining to the commission of that crime. But there are a number of cases, with none to the contrary, and which are in accord with common sense and reason, which hold that, where there are eyewitnesses, and there is no doubt as to how the homicide was committed, then the principle of law announced in the cited cases has no application whatever, and are as foreign to the case as could well be imagined. It is therefore clear that this subdivision of ground 2 requires no further discussion or consideration at our hands.

In urging subdivision (b) of ground 2, counsel seem

to have overlooked that in cases where an admonishment from the court is required the testimony complained of should have been either objected to at the time it was given or the attention of the court called to it in some manner before the failure to give the admonishment may be relied on. See McDaniel v. Commonwealth, 185 Ky. 608, 215 S. W. 544, and others cited in that opinion. But the purpose of the complained of testimony in this case was to establish, not only the conspiracy, but likewise the determination on the part of the conspirators to carry it out at whatever cost and regardless of consequences. It was purely substantive testimony, and for which reason it is extremely doubtful if an admonishment would be required if its introduction had been properly complained of. Moreover, it should be remembered that we are not authorized to reverse a judgment, not even one imposing the death penalty, except in cases where the error complained of clearly operated prejudicially to the rights of the one on trial, and in this case the testimony objected to in this subdivision could not possibly have prejudiced the rights of the defendant as to his guilt or innocence of what took place in the bank at the time Keenon was shot. In fact, scarcely anything could have happened at the trial to produce any other verdict in the case than one finding the defendant guilty, since the facts are practically undisputed. We therefore conclude that there is nothing of consequence in this argument.

In support of subdivision (c) of ground 2, chief reliance is had on the case of Powers v. Commonwealth, 110 Ky. 386, 61 S. W. 735, 63 S. W. 976, 22 Ky. Law Rep. 1807, 23 Ky. Law Rep. 146, 53 L. R. A. 245, in which the rule (which was already one of long standing) was approved that, in order to convict a member of a conspiracy who did not actually perpetrate the deed, it must have been committed in pursuance to the conspiracy and as a part of its execution. No fault is to be found with that principle, but the instructions in this case expressly so advised the jury by literally following the charge in the indictment, and this argument is based on an entirely false foundation, and for which reason it will receive no further consideration. Also in support of ground 2 it is argued that the court should have instructed the jury on accidental shooting, and upon the reckless handling of firearms by Glenday, resulting in the shooting of

Keenon. This argument is based upon a weird sort of surmise that Glenday must have shot Keenon either accidentally and without any intention so to do, or that he was recklessly handling his pistol when the shot was fired, but with no intention of wounding him. It is wholly and entirely without any facts upon which to base it. We concede that it would be proper, if there had been any evidence establishing either of such theories, to have instructed the jury thereon, and it would have been prejudicial error not to have done so. But the administration of the criminal law has not yet reached the stage where it is the duty of the court to give an instruction based upon facts for which there is no testimony to sustain, and which have no foundation other than an unsupported surmise. Glenday no doubt fired the shot because Keenon had not lifted his hands, or, perchance, the latter may have made a slight move of his hands or body which caused Glenday to believe it was necessary to fire the shot in order to prevent any possible interruption of the objects of the conspiracy. At any rate, defendant participated in, and consented to, not only the robbery, but the arming of the conspirators, for no other purpose than to kill or wound any one trying to prevent the obtention of the money and valuable effects of the bank by the conspirators, and thereby constructively consented to any act done by any of its members in furtherance of that purpose and to guarantee its successful perpetration.

It is also complained that the court erred in not saying to the jury that defendant should be acquitted if it believed that Keenon's death was due to a secret goiter with which he was afflicted, and which is based upon testimony of the physicians that the wound inflicted upon deceased was followed by septicaemia, which in turn may have been contributed to by poison from an inactive secret goiter, and which was aroused by the shock deceased received, and it became active. The two physicians who testified in the case state positively that the primary cause of decedent's death was the wound inflicted upon him by Glenday, but that, possibly, the dormant goiter may have become active under such conditions (one of which was the great loss of blood) and contributed to the poisoning in his system which was the ultimate cause of his death. Nowhere in the entire record is there any testimony that he would have died at that time from the effects of the goiter. It has been held too

630

many times to require the bestowment of time or space in pointing out that one is responsible for the consequences of his act, although it may have been contributed to by some other cause but which his act excited and put into operation. The court, therefore, did not err in failing to give either instruction contended for.

This record portrays a clear case of premeditated felonious action on the part of the conspirators, chief among which was defendant. At the time he was 36 years old, with no mental defect, possessing intelligence, possibly above the average. He chose to travel the thorny path of reaping where he had not sown, and in which he appears to have embarked in his chosen avocation. He preferred to pursue the devious course of an outlaw in preference to striving to become an upright, valuable, and useful citizen, and because of which it is difficult to entertain sympathy for him, or anything more than pity. But he is the architect of his own fortune, and must abide the consequences of his own course. His case is but another example of those who seem to think they are above the law and who prefer to be an enemy of society rather than a shining example in it. Under the facts, we are powerless to alleviate his situation.

Wherefore the judgment is affirmed; the whole court sitting.