## Graves v. Commonwealth.

(Decided Dec. 14, 1934.)

778

OSMOND FAIRWORTH BYRON and ROBERT O'DEAR for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Taking part in this sordid tragedy presented now to the court for review, were the appellant, his friend Robert Jones an employee of the Taylors, Illa B. Taylor, wife of the victim, and her son Charles P. Smith. Appellant on trial for enacting his part was given a death sentence.

C. W. Taylor and his wife lived at North Limestone street in Lexington, Ky., conducting a restaurant downstairs and a liquor business upstairs. About 9 o'clock on the night of March 1, 1934, the attention of persons living along Price's Lane, which runs westwardly from the Georgetown road not far from the Lexington city limits, was attracted by the rather unusual movements of two automobiles, and shortly thereafter by pistol shots. Upon investigation by residents of the neighborhood a man was found lying on the side of the road, apparently dead. The coroner was summoned and, arriving on the scene in a very short time, had no difficulty in determining that the man was dead from bullet wounds, and likewise no difficulty in identifying the body as that of C. W. Taylor. The body, in addition to the unmistakable evidence of death wounds in the back of his head, showed indications of having been dragged along the road. The point of entrance of the bullets was in the back of the head at the base of the skull, and as the coroner says, within a space that could be covered by a half dollar. A later examination of the car showed much blood on the front seat, and on the dashboard was found not only blood but particles of brain and skull.

Robert Jones, a friend of appellant was the first arrested in connection with the commission of the crime and made a written confession, which must have uner-

ringly connected the appellant with the slaying of Taylor. It is not a part of the record, but on March 3, two days after the murder, at which time appellant was apprehended, the chief of police of Lexington, together with other officers, presented to Graves the confession of Jones and told him to read it. This he did, saying, "If Jones has told the truth about this, I want to do the same thing." He then made a statement which was taken down in shorthand, transcribed and handed to him to read, and after directing a correction, signed it under oath.

In this statement he said that Jones had come to him some time in February and said he had a job for him. Graves asked if it was a whisky job, and Jones told him he would tell him about it later. In about a week Jones saw Graves again and said, "Now is the time to bump off Mr. Taylor," and Graves asked Jones, "What's in it?" and Jones replied, "Mrs. Taylor will give $50.00 to you for knocking off Taylor." He then recites how Jones took him to the Taylor home and placed him in the garage. Graves left soon after being placed there, but the next night Jones came again, and they again went to the garage, but when they got there Graves said "It is too late." He then tells how Jones came again bringing Smith with him, and when Smith asked him if he was going to do the killing Graves answered, "Yes." Later that night Jones and Graves met, and after some talk which indicated a plan for all of them to go out in Taylor's car to get some whisky, they got in the car, Taylor driving; Jones on the front seat with Taylor, and Graves in the back seat. After dodging some police officers, they proceeded to Price's lane. They saw a car on the side of the road and Taylor said, "There's the car sitting there, maybe that's it." Graves said, "Taylor looked as if he put his hand in his pocket," and he, not knowing what was going to happen, shot Taylor two or three times. Jones, at Graves' command, then took Taylor out of the car, got in under the wheel and drove back to town leaving Taylor's car at Pine and Patterson streets, and the two took a taxi, Graves going home. Shortly thereafter Jones and the Smith boy found Graves and handed him some money saying, "There's your money, count it." Graves says he was forced into the killing, but was not making the statement to get any one else in trouble. After he read the typewritten statement he agreed that

it was correct as far as written, but directed the following to be inserted:

"When I got to the car the night of the killing it was not my intention to go or do anything, but I was afraid they were framing me, so I got in."

The Fayette county grand jury returned an indictment on April 10, 1934, in three counts. In the first, Graves, Jones, Mrs. Taylor, and Charles Smith were charged with the murder of Taylor. The second count charged the four of a consummated conspiracy to murder Taylor, and the third count also charges a conspiracy, but sets out more in detail the plans and purposes.

On the day the indictment was returned, Graves being without means to employ counsel, the court appointed a member of the bar to defend him, and the trial was set for the 19th day of April, on which day it was held, with the result that the appellant was found guilty and his punishment fixed at death. Motion for a new trial was made and overruled. Judgment was entered and the defendant appeals.

Counsel for appellant frankly admits the fairness accorded to his client by the court during the progress of the trial, but insists that the court failed to give a peremptory instruction or to give the whole law of the case. However, since the most severe penalty known to our law has been inflicted in this case, it is thought proper to take up, not only such objections and exceptions as are of record, but such as are discussed in appellant's brief.

Counsel decries his want of skill in the conduct of the trial, and the presentation of his client's cause in this court. In reply the court says frankly that a perusal of the record in its entirety does not disclose that lack of skill on the part of counsel, which he modestly attributes to himself. He speaks also of the lack of experience. It is to be doubted that any more experienced lawyer could have more properly conducted this client's case or guarded his rights to better advantage; certainly with no more zeal than is evidenced here.

We shall take up the various contentions of appellant, and dispose of them, not necessarily in the order as presented.

1. It is asserted that the court erroneously ad-

mitted the confession of defendant, because same was not voluntarily made. Graves does not himself claim this to be true. Nowhere in his testimony did he make or undertake to make a showing that the statement was other than wholly voluntary. Chief of Police Thompson and other officers, including the city manager, show that Jones' statement was handed to Graves who read it, and at once said that if Jones had told the truth he might as well do the same thing. He was told at least four or five times that any statement made by him would be used against him. Morton, the city manager, asked Graves if any one had forced him to make a settlement and he replied, "No, I killed this man and got paid for it." There was no attempt to show that Graves was threatened, coerced, intimidated, or promised reward or immunity. There was an entire absence of any "third degree" methods. The statement was legally and properly obtained, and was competent. Hutsell v. Com., 225 Ky. 492, 9 S. W. (2d) 132.

2. The demurrer to the indictment was properly overruled. We have considered it carefully and it is clear, unequivocal; drawn in plain unmistakable and understandable language, naming the crime and charging the manner of its commission so as to fully comply with the requirements of the Criminal Code as construed by this court.

3. Counsel suggests that the court should have given a peremptory instruction for appellant on the close of the commonwealth's testimony, and if not then, at the closing of all evidence. The court did not err in overruling these motions, as will be made to appear on the discussion of other points.

4. Counsel complains that the court did not give all the law of the case, contending that since the proof showed that Graves withdrew from the conspiracy, the court should have somewhere called the jury's attention to this fact, so as to give the appellant the benefit of such favorable proof.

The evidence taken as a whole, and particularly the appellant's evidence, did not justify any such instruction, even though there had been found a place in the instructions into which the idea might have been woven. Again it very clearly appears to the court that appellant was tried on the first count of the indictment, which charged plain murder. The instructions given by the

court were on the charge of murder. The word "conspiracy" is not mentioned in the instructions. The court is not inclined to the belief that the proof justified any such claimed instruction or reference in an instruction, and it is doubtful if accused was entitled to the given self-defense instruction.

It is shown that when Jones broached the subject of killing Taylor for $50, Graves said it was out of his line, and he did not believe he could do it. Again he said to Jones that he would not do it, "kept throwing him off." However, even a casual reading of the testimony would not impress the court with the belief that he at any time abandoned the *purpose* to be effected, though he may have disagreed to *plans*. It takes no close analysis of the proof to indicate to any open mind that the appellant was at all times ready, able, and willing, and it is clearly perceivable that Graves only objected to the plans as laid out for him, and rather desired to set the stage according to his own notion.

Certain statements that he made, if taken alone without regard to context, would indicate, at the most, a reluctance or unwillingness; but when the whole testimony is considered it is quite clear that he never abandoned the purpose of killing Taylor. In discussing the matter with the Smith boy, Graves said: "I said it would be too bad a job for $50.00, and then have to throw away a $35.00 pistol. That's poor business." Again he said: "I could not kill him with my pistol. Everybody in the East End knows my pistol. He said I could put some coal oil on it, or I could get Bobtown's pistol. I said I was afraid it would jam on me. I did not know the pistol." He also says that Smith agreed to hide his mother's pistol in the garage where he could get it and use it. He objected to that plan. Asked by counsel for the commonwealth, "But you did not tell the boy in that conversation that you would not do the job, did you?" Graves replied: "No, I did not. I was stalling him." Again asked if he told Jones he could not go through with it, he replied: "No, I thought he would know from my actions that I did not want to do it. The main thing I talked to the boy about was trying to show him I could not do it. I said if I could take him out of the state it would be better, but if I did do that $50.00 would not be enough for expenses and any profit." Asked if he told the boy the night before the killing that he would not do it, he replied: "No, I never

did, they wanted the thing done too quick.'' Again Graves said: ''I said it was too high-powered for me to try. I said, 'you can't kill that man and get away with it; $50.00 would not get me out of it.' ''

But why multiply instances which are scattered all through his testimony that show an objection only to the plans and the price to be paid? However, with all his claims of reluctance we find him just a few hours before the tragedy still claiming unwillingness, and some fear, yet ready and armed to carry out the purpose, although by a different method. The Smith boy was with him insisting strenuously that the killing be done that night, saying to Graves: ''Mamma is getting tired of carrying the $50.00 around, and wants this done right now.'' He proposed that Graves come out to the house and ''knock lightly at the door, like you are going to buy some whiskey.'' The boy was to turn the lights off and, ''when the gun goes off you can run down Seventh Street.'' Graves' only objection at that time was that he did not want to do it that night; ''that they wanted it done too quick''; ''things like that has got to be worked out.'' He said in response to a suggestion that the boy left that evening before Graves told him that he would or could not do the killing, ''I would not have been talking to him if I was not going to do it I reckon.''

Early on the night of the killing Graves and Jones are found together. The boy had fixed the killing time at 7:30 at the garage. Jones said to Graves: ''It's nearly 7:30, you had better be going.'' Graves answered:

''I am not going, it would be a bad proposition to do a killing for $50.00 and then have to throw away a $35.00 gun * * * there is too much chance of getting caught if I do not do away with the gun. I had not thought about doing it that way.''

The real opportunity to do the killing came shortly after that last conference between Graves, Jones, and the Smith boy. Graves and Jones turned up at a place on Wade street and Taylor came to the place. A conversation was had about a drink. The three went out and got in Taylor's car, Taylor driving, Jones in the seat with Taylor, and Graves alone on the back seat. Graves insists that he went reluctantly, as he claims he thought Taylor and Jones were going to take him out

and kill him because he had agreed to kill Taylor for $50. There was little said on the trip which ended in Price's Lane. Graves claims just before he killed Taylor that Taylor exhibited a gun and said, "This is a nice thing to have along." Jones says the same thing, but says Taylor put the pistol back under his coat. When they got into the lane a short distance they saw a car standing on the side of the road and Taylor remarked, "This must be the car," and slowed up, still with his hands on the wheel and the car still in motion. Graves said he felt that Taylor was going to kill him then and there. He also thought he was in possible danger at the hands of Jones. He fired and put three bullets in Taylor's head, all entering at the base of the skull and near together. He said he knew he had hit Taylor in the head because, "Well, I am a pretty good shot, and I knew he must have been hit in the head; that is where I aimed to hit him."

After the firing the car was stopped. Jones took Taylor's body out and dragged it to the side of the road. This movement was at Graves' direct command. Jones then took the wheel and they drove back to Lexington, leaving the car at the point, and the two separating, as heretofore mentioned.

Jones had testified for the commonwealth giving enough damaging testimony, when it is read in connection with Graves' testimony, to lead the court to conclude that the final plan was formulated after the Smith boy left Graves and Jones in the early evening of the day of the killing. Jones says that some time that evening he had called Taylor. He thought Graves had also called him, though Graves denies this statement. The conversation led up to obtaining some whisky which Taylor was to get. Jones says he afterwards saw Taylor, who told him to find Graves. He had no difficulty in doing this, and in completing the arrangement for the meeting of all three of them. Jones also says that some time that evening Graves told him his car was broken down and he did not have any one to go and get his whisky, and that Graves told him he and Taylor were going out to Price's lane to get the whisky, and after that conversation Jones called Taylor up; he says he "thought he might want him to work"; Taylor told him he wanted to go out and get some whisky.

It is shown that on the night of and after the killing Graves took his pistol and gave it to his girl Mary

Jones, who hid it in the basement of the home where she worked; the officers recovered it from her. The officers also obtained $49 of the $50 given to Graves from his mother. It also appears that Graves disappeared from his usual haunts for a day or two. On a night after the killing Jones and young Smith hunted Graves up, and Smith gave Graves a pint of whisky and some money, saying, ''There's something for you, count it,'' and also said:

"I will take care of that part about the gun. You needn't worry about it. Me and mamma will take care of the gun part."

Graves admits that he took the money, spent some of it for whisky, and gave the rest to his mother to keep. Later he told his mother when she informed him that they were looking for him, ''Don't say anything, just tell them 'here it is' and give them the money.''

The resume of the testimony answers fully the contentions that the jury should have been told to consider Graves' abandonment of his part in the conspiracy, and that a peremptory should have been given at any stage of the case.

5.  We have given more than ordinary care in reading the court's instructions. The court seems to have been extremely careful and cautious in giving to the accused the benefit of every possible warranted instruction, including both manslaughter and self-defense instructions, all correctly phrased. There was no error in the instructions as given, and none in failing to give any other instruction.

6.  Notwithstanding no objection was made to the testimony of Jones, undoubtedly the accomplice of Graves, the court was careful to instruct the jury upon the measure, weight, and effect to be given this character of evidence, and to define clearly the word ''accomplice,'' and in the light of the extrinsic testimony just above set out, we hold that Jones' testimony was competent under the rule that the testimony of an accomplice is incompetent unless there be other evidence tending to connect the accused with the commission of the offense. See Glenday v. Com., 255 Ky. 313, 74 S. W. (2d) 332; Tincher v. Com., 253 Ky. 623, 69 S. W. (2d) 750.

7.  It is complained that the verdict is the result

of passion, prejudice, and bias. While counsel states in his brief that excitement about the courthouse at the time of the trial was at high pitch, that the courtroom was aflame with indignation, and feeling was running high, particularly against Mrs. Taylor, still there is nothing in the record with relation to these matters; nothing shown officially upon which the court could predicate a ruling, or arrive at any conclusion other than is expressed in the firm belief that the accused received a fair and impartial trial, free from any semblance of bias, prejudice, or of prejudicial error.

The court therefore cannot disturb the judgment of the lower court, which is now affirmed.

Whole court sitting.